IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:04CR3084 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| DAVID S. DETWEILER, | ) | |
| | ) | |
| Defendant. | ) | |

The defendant, David S. Detweiler, was sentenced on January 31, 2006, to 188 months in prison for his involvement in a methamphetamine conspiracy. He has filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, claiming ineffective assistance of trial counsel. On July 27, 2007, after conducting an initial review of the motion, I directed the government to file an answer and also indicated that a separate motion for summary judgment could be filed. Both such filings were made by the government on August 14, 2007, and Detweiler has since responded. Upon careful consideration of the pleadings, briefs, and evidence, I find and conclude that the government's motion for summary judgment should be granted, and that the defendant's § 2255 motion should be denied in all respects.

As summarized by the Eighth Circuit in affirming Detweiler's conviction on direct appeal, the evidence presented at trial was essentially as follows:

> At trial, the government called eight witnesses who described their drug dealings with Detweiler. Wendy Esquivel (Esquivel) testified that for about four months during 2003, she provided five to six ounces of methamphetamine per week to her then roommate, Troy Berner (Berner). Berner then sold methamphetamine from Esquivel's apartment to different customers, including Detweiler. Esquivel testified Detweiler purchased quantities ranging from one-eighth ounce to two ounces at a time, but usually one ounce, at least several times per week. Sales also occurred at Detweiler's residence. Detweiler occasionally purchased the

drugs on credit, and Esquivel testified Detweiler occasionally told Berner others were waiting to purchase the drugs.

Testimony by other witnesses detailed how and to whom Detweiler sold methamphetamine. Brian Manchester (Manchester) testified Detweiler sold him one-eighth ounce to one ounce quantities sporadically during winter 2002 through fall 2003. Manchester usually paid cash, but occasionally he obtained the drugs on credit. Manchester once purchased methamphetamine from Detweiler to sell the drugs to Jason Ramsay (Ramsay). Ramsay testified Detweiler would not deal with him directly, because Ramsay previously had been arrested for possession of drugs.

Manchester also testified Detweiler sold drugs to Tryson Peak (Peak), Peak sold drugs to Manchester, and Peak owed money to Detweiler for past drug debts. Detweiler told Manchester he sent some people to collect from Peak, succeeding in collecting only some of the debt. Detweiler asked Manchester in the summer of 2002 to help him collect the remaining money.

Testimony also included details of Detweiler supplying other individuals with methamphetamine, including Darren Cink (Cink) (one-sixteenth to one-eighth ounce quantities on twenty to thirty occasions in 2002), John Chism (Chism), Richard Roberts (Roberts) (one-half gram to one-fourth ounce quantities five to six times during the spring and summer of 2003), Ryan Johnson, Matt Spires, and Anthony Campbell.

(Filing 74, at 2-3.)

Detweiler complains that his attorney failed to interview Peak, Cody Scott, and Berner, and to call them as witnesses at trial. Peak and Scott have provided affidavits outlining their possible testimony, while Berner has indicated in an unsworn letter that he would be willing to testify if he could do so without incriminating himself.

Peak states in his affidavit that had he been called as a trial witness, he would have testified (1) that Peak never owed Detweiler large amounts of money; (2) that Detweiler never made an agreement to continue selling methamphetamine with Peak if Peak "would not put [Detweiler's] name out there on a proffer";[1] (3) that Peak never entered into an agreement whereby he would purchase methamphetamine from Detweiler for the purpose of reselling it to someone else; (4) that Peak and Detweiler were not in the business of selling methamphetamine together; (5) that Peak used to be good friends with Manchester and knows him very well, but a relationship no longer exists between them; (6) that Manchester can be a very irate, jealous, and vindictive person; and (7) that Detweiler had mentioned on a number of occasions that Manchester was always asking Detweiler to find him methamphetamine and became angry when Detweiler declined. (Filing 82, Exhibit B-1.)

Scott states in his affidavit that had he been called as a witness, he would have testified (1) that Scott was never introduced to Manchester by Detweiler for purposes of obtaining methamphetamine for Manchester;[2] (2) that Manchester and Scott never entered into an agreement whereby Scott would sell methamphetamine to Manchester for the purpose of him selling it to someone else; and (3) that Manchester and Scott were not in the business of selling methamphetamine together. (Filing 82, Exhibit B-2.)

In Berner's letter, Esquivel is described as "nuts" and Berner states that he "think[s] what she is trying to do is pawn all her weight on anything and anyone she can. . . . [S]he's trying to pawn shit off on [Detweiler] that is grossly exaggerated and I mean grossly. She's trying to save her ass." (Filing 82, Exhibit D-1.)

---

[1] Manchester testified that Detweiler told him there was such an agreement. (Transcript (filing 64), at 89.)

[2] Manchester testified that Detweiler introduced him to "a guy by the name of Cody" so that Manchester could purchase methamphetamine from him. (Transcript (filing 64), at 91.)

3

At trial, the jury was informed that neither Peak nor Berner had implicated Detweiler during their proffer interviews with the police. A written stipulation (exhibit 102) was read to the jury that stated:

> Number one, that if Officer Haney of the Lincoln Police Department was called to testify, he would explain he conducted a proffer interview of Tryson D. Peake,[3] date of birth 9-29-73 on Sunday, December 1st, 2002, at the Lincoln Police Department. Haney had Peake sign a proffer letter and gave him the standard admonition given to a person proffering to law enforcement that he wanted Peake to be truthful and not to minimize or maximize his or anyone else's involvement in the distribution of narcotics. During the course of that interview, Peake detailed his methamphetamine dealings with 14 people, including Brian Manchester and Jason Ramsay, but never made any mention of David Detweiler as being involved in the distribution of drugs.
>
> Number two, that on January 23rd, 2003, and February 5th, 2003, Officer Kepke of the Lincoln Police Department conducted follow-up interviews with Tryson Peake at his attorney's office in Lincoln, Nebraska, in which an additional seven people were mentioned by Peake as being involved in the distribution of narcotics. Again, David Detweiler was not mentioned by Peake during those interviews.
>
> Number three, on August 11th of 2003, Officer Kepke of the Lincoln Police Department conducted a proffer interview with Troy Berner, date of birth 6-11-68, pursuant to a signed proffer agreement and the standard admonition about being truthful. Berner described his methamphetamine dealings with nine people, including Wendy Esquivel and Brian Manchester. At no time during the interview did Troy Berner mention any type of drug dealing with David Detweiler.
>
> Number four, Officer Bauer of the Lincoln Police Department conducted a proffer interview with [sic] the Lancaster County jail in Lincoln, Nebraska, with John Chism, date of birth 1-27-72, on

---

[3] This is the spelling used in the trial transcript.

4

> November 11th, 2004. Chism's attorney was present for the interview and a proffer agreement had been signed. Officer Bauer told Chism to be truthful and not minimize or maximize his or anyone else's involvement in drug distribution. Chism detailed his drug dealings with 26 people including Darren Cink, but he made no mention of purchasing from or observing sales by David Detweiler.
>
> Number five, Officer Bauer conducted a follow-up proffer interview with John Chism on December 31st, 2004, in which additional information was provided, but no mention was ever made by Chism of David Detweiler.

(Transcript (filing 67), at 347:19-349:9.)

Manchester testified on cross-examination that he decided to make a proffer after learning that he had been named in proffer interviews given by other persons, including Peak. (Transcript (filing 64), at 100-102.) Manchester admitted that he had a strong dislike for Peak. (Transcript (filing 64), at 102-103.) He also admitted that he never saw Detweiler sell methamphetamine to Peak, that he just knew they were dealing together. (Transcript (filing 64), at 103.) Consistent with Peak's affidavit, Manchester also testified on cross-examination that Detweiler was not selling him the quantities of methamphetamine he wanted in the summer of 2002, so he then started buying from "Cody" after being introduced to him by Detweiler. (Transcript (filing 64), at 110.)

To prevail on his claim of ineffective assistance of counsel, Detweiler must show both deficient performance and prejudice.

> Under the Supreme Court's well-established standard in *Strickland v. Washington*, a convicted defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88, 104 S.Ct. 2052. To establish

5

> prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.... [T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 693, 695, 104 S.Ct. 2052.

*United States v. Watkins*, 486 F.3d 458, 465 (8th Cir. 2007). The court does not need to address the competency of counsel's performance if the prejudice issue is dispositive. *Blankenship v. United States*, 159 F.3d 336, 338 (8th Cir.1998) (citing *Strickland*, 466 U.S. at 697 (noting "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.")).

"When determining if prejudice exists, the court 'must consider the totality of the evidence before the judge or jury.'" *Williams v. United States*, 452 F.3d 1009, 1013 (8th Cir. 2006) (quoting *Strickland*, 466 U.S. at 695)). "In doing this analysis, the court should be 'mindful of (1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution.'" *Id.* (quoting *Strickland*).

In this case, there was strong evidence presented by eight prosecution witnesses (Manchester, Ramsay, Cink, Esquivel, Michele Young, Roberts, Johnson, and Campbell) to establish Detweiler's guilt. It is very unlikely that Peak's and Scott's testimony, as outlined in their affidavits, would have made any difference to the outcome of the trial. Peak does not deny that he bought methamphetamine from Detweiler or sold methamphetamine to Manchester; he only denies that he owed Detweiler "large amounts of money" and that they "entered into an agreement" for purchasing and reselling methamphetamine. Similarly, Scott (or "Cody") does not

6

deny that he sold methamphetamine to Manchester; he only denies that he "entered into an agreement" to sell methamphetamine to Manchester for purposes of resale. Scott also denies that Detweiler introduced him to Manchester "for purposes of obtaining methamphetamine for Brian Manchester," but does not deny that the introduction was made. It is questionable whether Berner would have provided any testimony, but even if it may be assumed that he would have contradicted Esquivel's testimony regarding the quantity of methamphetamine that Detweiler purchased from him, it does not appear that his testimony would have exonerated Detweiler or shown that the conspiracy involved less than 500 grams of methamphetamine.

I conclude that Detweiler is unable to establish that he was prejudiced by his attorney's alleged deficiencies in performance. Accordingly,

IT IS ORDERED that:

1. The government's motion for summary judgment (filing 86) is granted.

2. The defendant's motion for leave to proceed in forma pauperis (filing 83) is denied without prejudice, as moot.

3. The defendant's motion (filing 89) and amended motion (filing 90) for appointment of counsel and for an evidentiary hearing are denied.

4. The defendant's § 2255 motion (filing 82) is denied on the merits.

5. Judgment shall be entered by separate document.

October 26, 2007.  BY THE COURT:

s/ *Richard G. Kopf*
United States District Judge